Johnson *v.* Kentucky Central Life and Accident Insurance Co., Appellant.

Argued October 10, 1940.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

*Ira Jewell Williams, Jr.,* with him *Charles M. Willits* and *Ira Jewell Williams,* for appellant.

*Morris Moskovitz,* with him *Morris Goldman,* for appellee.

OPINION BY STADTFELD, J., March 1, 1941:

This action was brought by plaintiff to recover the "accidental death" benefits provided for in a policy of insurance issued by defendant to plaintiff's mother, Hattie Jackson, the insured, who died August 13, 1935. These benefits were payable in the event "of the death of the insured, resulting directly and independently of all other causes through external, violent and accidental means, provided death of the insured occurs within ninety (90) days from date of accident, provided the company shall not be liable for the payment of any sum whatsoever ...... if such injury be sustained at a time when the insured is insane or not in the present full possession and normal exercise of all his faculties."

Plaintiff's statement of claim averred that Hattie Jackson died on August 13, 1935, "as a result of an intracapsular fracture of the left femur, caused by a fall in her home ...... which fall was accidental, and resulted in her death within ninety days after the accident." The affidavit of defense denied that the insured died "directly and independently of all other causes through external, violent and accidental means"; it averred, on the contrary, that the insured died as a result of myocardial degeneration and bronchial pneu-

monia; it further alleges as new matter, the execution by the plaintiff, of an instrument releasing defendant from any and all claims under the policy. Plaintiff's answer to new matter admitted the execution of the instrument but averred that it was obtained by the fraudulent representation of defendant's agents. The case proceeded to trial upon these issues.

Plaintiff's testimony showed that she and her mother had lived in the same house for eight years. During that entire period there was a hole in the middle of the kitchen floor. The hole was approximately ten inches by three inches in area and existed by reason of the absence of a portion of the floor boards. On the day of the injury, July 14, 1935, plaintiff and her mother were working in the kitchen. Plaintiff testified that as she stood looking out of a window in the kitchen, about ten or twelve feet from her mother, she heard her fall and found her on the floor, and that was all she knew about it. Such was the substance of plaintiff's evidence on cross-examination covering her testimony on the point given on direct examination as follows: "Q. ...... Mrs. Johnson, did you notice just how your mother caught in the floor, into the hole in the floor? A. She was caught by the front of her foot tripped over this floor. Q. Did she fall to the floor? A. Yes, she fell to the floor. Q. Did you see her fall? A. Well, I wasn't looking right at her. *I turned around at the time, and, of course I heard the crash—she was going down then—* and I ran to her to pick her up, and she said, 'No, let me lay. I am sick in my stomach.' " The insured was found fully conscious but suffering from two fractures of the left femur. On July 17, the insured was removed to a hospital. There she was placed in a cast and confined to bed. Approximately five or ten days later, while confined to bed in the hospital, insured contracted bronchial pneumonia and died on August 15, 1935. Plaintiff testified the insured was fifty-six years of age.

Dr. Shaner testified that he was called to see the insured on July 15, 1935, and again on July 17, 1935, and that his diagnosis was a probable fracture; that he made no other physical examination of her at the time, but received from her a history of her present condition—to wit, that she had fallen in the kitchen; that he had ordered her removed to the hospital when he made his first visit on July 15, but she did not go, and that when he returned on July 17 he insisted upon her being removed to the hospital. That is all the testimony which was produced relative to the occurrence of the accident.

The medical testimony was supplied by three other physicians. Dr. Gelehrter testified that he X-rayed the insured and his findings revealed two fractures of the left hip, an inter-trochanteric fracture and an intra-capsular fracture of the left leg. He further testified that an injury of some sort was necessary to produce that type of fracture, "some sort of an accident or violence or collision."

Dr. David Finkelstein, called on behalf of plaintiff, testified that he was an interne at the Philadelphia General Hospital at the time of insured's admission thereto; that he examined the insured and the X-ray pictures of insured's left femur; and that the insured was under his care during the entire time that she was in the hospital. He testified that the direct cause of insured's death was due to her fracture or her fractures. In response to further examination, Dr. Finkelstein stated that the surgical diagnosis of insured disclosed that "there was some degree of heart disease present, probably on an arteriosclerotic basis". He further testified that the insured developed bronchial pneumonia due to the fracture by reason of the fact that the patient was an elderly woman and was compelled to be on her back. It was his opinion that the primary cause of the insured's death was the injury to her hip, contributory causes being latent syphilis, arteriosclerotic heart

disease and bronchial pneumonia. He attributed no effect to the latent syphilis. He explained the effect of the heart disease by stating that if the insured had not suffered the fracture, she probably would have "continued to navigate" in similar circumstances, but the heart disease was certainly aggravated by the fracture and by confinement to bed. He attributed the bronchial pneumonia to her confinement in bed.

Dr. Fishback, defendant's medical witness, testified that he performed an autopsy on the insured, and that his findings disclosed an intracapsular fracture of the femur, myocardial degeneration, chronic splenitis; congestion and nephrosclerosis of the kidneys; slight degeneration of the liver; chronic inflamed gall bladder and gall stones; and luetic aortitis. He testified that the chronic splenitis did not contribute to the cause of death, nor would he say that the slight degeneration of the liver contributed to the cause of death. In his opinion, the cause of death was the intracapsular fracture of the femur, pulmonary oedema, luetic aortitis being the contributing causes. Explaining the relationship of these conditions, he testified that he did not believe leutic aortitis (syphilitic condition of the large vessel of the heart) was the immediate cause of insured's death, nor did he believe that the heart trouble was of such an intense grade as to have produced oedema at that particular time and place. In this particular case, he testified, the intracapsular fracture of the femur precipitated the pulmonary oedema, which alone may produce death.

With reference to the execution of the release by plaintiff to the defendant company, J. Madison Moore, superintendent of the Weekly Health and Accident Department, testified that he explained the contents of the release and paid plaintiff one hundred and twelve dollars before she executed it. Plaintiff, however, testified that she signed two papers, the contents of which she could not and did not read; that the papers were

not read to her and that the representative had explained to her that the payment then made was part payment and that she could get more than the one hundred or one hundred and twelve dollars.

Upon this testimony, the case was submitted to the jury by the trial judge and verdict was returned in favor of the plaintiff. Defendant's motions for a new trial and for judgment n. o. v. were overruled, and from the entry of judgment on the verdict, this appeal was taken.

The contention made by appellant on appeal is that the verdict is opposed to the evidence, there being no evidence of an "accidental death", nor any evidence that the insured's death resulted "directly and independently of all other causes through external, violent and accidental means."

A careful review of the testimony convinces us that the question of whether the insured suffered a fracture of the hip as a result of an accidental fall was properly submitted to the jury. Viewing the evidence in the light most advantageous to the plaintiff and giving her the benefit of every reasonable inference of fact by reason of the jury's verdict, we cannot say that the jury's finding was improper. From the testimony of the plaintiff relevant to the circumstances of the insured's mishap, it may even be inferred that insured did trip in the hole in the kitchen floor, and that the plaintiff got some glimpse of the occurrence. Aside from simply stating that the insured tripped, plaintiff testified that she turned around, heard the crash, and saw her mother "going down then". It further appears from the evidence that insured was fully conscious when the plaintiff came to her assistance a moment later.

Under these circumstances, the cases of *Kelly v. Prudential Ins. Co.*, 334 Pa. 143, 6 A. 2d 55 and *Pomorskie v. Prudential Ins. Co. of America*, 318 Pa. 185, 177 A. 783, cited therein, are controlling on the question of insured's accidental fall. In the Kelly case, the in-

sured died from a fall sustained as she descended a flight of steps leading down to the unlighted cellar in her home. There were no eye-witnesses to the occurrence. She was found at the foot of the steps. Near her, was a commode which was broken in pieces and covered with blood stains. Mr. Justice MAXEY, in permitting the verdict for the plaintiff to stand, said, p. 148: "...... There was evidence from which it could be legitimately inferred that the fall which Mrs. Daley sustained was the result of a misstep which she made in the dark on the stairway, without giving any consideration to the afterwards excluded declaration made to appellee that this was what occurred. It is true that appellee's evidence afforded also the contrary inference, that the fall was the result of an attack of vertigo, but this rested solely on the testimony of a physician, reading from his hospital record, that he had been so informed by the insured while seriously afflicted. Such conflict as there was, was for the jury to reconcile, as by its verdict it did: (citing cases). The case is not comparable to *DeReeder et al., v. Travelers Ins. Co.*, 329 Pa. 328, 333, 198 A. 45, where 'there were no facts from which the jury could infer legitimately *to the exclusion of other inferences equally plausible* that the insured's death resulted from an accident.' There was indeed stronger evidence in favor of an accidental cause of death than in *Wainstein v. Equitable Life Assurance Society*, 318 Pa. 428, 178 A. 502, and *Pomorskie v. Prudential Insurance Co. of America*, 318 Pa. 185, 177 A. 783, in which latter case *the jury was permitted to infer merely from the fall which the insured sustained, without more, that it was the result of an accident.*" (Italics supplied).

In considering the second question raised by appellee, to wit, whether the death of the insured resulted directly and independently of all other causes through external, violent and accidental means, we have carefully examined the relevant medical testimony. Dr. Finkelstein, for plaintiff, and Dr. Fishback for defend-

ant, both testified that the direct cause of the insured's death was due to the fractures sustained in the fall. Pneumonia and heart disease were regarded by both as contributory causes. Dr. Finkelstein explained that the fractures aggravated the heart disease and that pneumonia resulted from the insured's being confined in bed by reason of the fracture. Dr. Fishback explained that the heart condition was not so intense as to have produced pulmonary oedema at the time and place, but rather that oedema was precipitated by the intra-scapular fracture of the femur.

The court below instructed the jury that if it found "from the evidence produced 'here that the efficient and proximate cause of the death of Hattie Jackson was the accident she sustained, the fracture of the femur, the plaintiff would be entitled to a recovery under the terms of the policy." The lower court, however, refused defendant's fourth point for charge to the effect that "if the death of the insured resulted partly from illness and partly from accidental means, then the plaintiff is not entitled to recovery". This refusal was covered by appellant's second assignment of error. The court also declined defendant's fifth point for charge, which, was as follows: "5. If illness such as heart disease, or myocardial degeneration, or bronchial pneumonia, or the like, in any manner contributed to the death of the insured, even though the insured suffered an accident which might have contributed to death, then your verdict must be in favor of the defendant." This refusal constitutes appellant's third assignment of error.

The terms of the policy in the instant case provided for the payment of the accidental death benefit in the event "of the death of the insured, resulting directly and independently of all other causes through external, violent and accidental means." The effect of this restrictive clause alone in a policy of insurance has been settled in this State by a series of decisions,

of which the leading one is *Kelley v. Pittsburgh Casualty Co.,* 256 Pa. 1, 100 A. 494, cited with approval in later cases. Distinguished from that case are those cases which involve the construction of policies of insurance containing an additional restrictive clause avoiding payment of the indemnity where "death of the insured results directly or indirectly from disease or from bodily or mental infirmity". Representative of this line of cases are *Ewing v. L. A. S. of U. S.,* 320 Pa. 577, 182 A. 369; *Arnstein v. Metropolitan L. Ins. Co.,* 329 Pa. 158, 196 A. 491; *Lucas v. Metropolitan L. Ins. Co.,* 339 Pa. 277, 14 A. 2d 85; *Real Estate Trust Co. of Phila. v. Metropolitan L. Ins. Co.,* 340 Pa. 533, 17 A. 2d 416. The distinction that exists between the two types of policies has been clearly set forth in the last cited case wherein all of the foregoing cases have been appropriately classified so as to establish the distinguishing rules of construction.

The rule of construction established by the second class of cases is as follows: Where the liability of the insurance carrier is limited by both restrictive clauses, it is not sufficient for the insured or his beneficiary in case of death to establish a direct causal relation between the accident and the death or disability. He must show that the resulting condition was caused *solely* by external and accidental means, and if the proof points to a pre-existing infirmity or abnormality which may have been a contributing factor, the burden is upon him to produce further evidence to exclude the possibility.

The rule established by the Kelley case, however, is as follows: Where the liability of the insurance carrier is limited by the one restrictive clause referred to, that exception in the policy will not relieve the insurer if the accident is the moving, sole and proximate cause of the death, even though a pre-existing disease or physical infirmity be a necessary condition to the result. In that case the court below adopted the following quota-

tions as determinative of liability: "If disease, while existing, be but a condition and the accident the moving, sole and proximate cause of the death, the exception in the policy will not relieve the insurer for death so caused' ". (p. 6) And, " 'The fact that the physical infirmity of the victim may be a necessary condition to the result does not deprive the injury of its distinction as the sole producing cause. In such case, disease or low vitality do not arise to the dignity of concurring causes, but ...... appear rather as the passive allies of the agencies set in motion by the injury ...... Where accidental injury aggravated a disease, and 'thereby hastened death so as to cause it to occur at an earlier period than it would have occurred but for the accident, it is the direct, independent, and exclusive cause of death ...... The phrase "resulting directly, independently and exclusively in death," refers to the efficient or, as some courts speak of it, the predominant cause of death ...... the language of this policy does not mean that there shall be no liability in case death results from the aggravation of a pre-existing disease' ". (p. 7). The Supreme Court affirmed without opinion. See, *Real Estate Trust Co. of Phila. v. Metropolitan L. Ins. Co.*, supra.

In the instant case, the evidence clearly supported the facts that the insured was at least fifty-six years of age at the time of her death, and that she suffered in some degree from arteriosclerosis which is present in all persons past middle age to some extent. Plaintiff's medical testimony disclosed that the insured had some degree of heart disease, on an arteriosclerotic basis, aggravated by the fracture, in the absence of which she would probably have "continued to navigate". From this evidence, the jury could properly find that insured's heart disease may have been a condition, and even a necessary condition, as defined by law, of her death, but such a finding would not preclude the additional

finding that the accidental fall was the proximate cause of her death.

Likewise, the evidence is clear from the testimony of both plaintiff's and defendant's medical witnesses that the insured had developed pneumonia as a result of being confined to bed by reason of the fractures she had sustained, and that pneumonia would not have occurred but for the fractures.

In *Dale v. Stand. Accident Ins. Co.*, 307 Pa. 398, 161 A. 307, where a policy similar to the one in the instant case was involved, the insured sustained a fracture on January 16, 1930, developed pneumonia and died on March 20, 1930. Affirming the judgment on the verdict for the plaintiff, the Supreme Court said, " ...... the proximate cause of death was, as the jury found, the accidental injury received on January 16, 1930. 'There was no break in the continuity of the consequences of the injury, and no intervening cause in the resulting disability': *Farner v. Mass. Mutual Accident Association*, 219 Pa. 71, 76."

We are of the opinion that the evidence was properly submitted to the jury under a correct charge as required by the terms of the policy involved in this case.

The assignments of error are dismissed and judgment is affirmed.